**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. 1:26-cv-25518-ALTONAGA/Reid

ROBERT RAMKISSOON, BRIAN KEITH DAVIS, JR., ERIC MULLINS, WAYNE BENSFIELD, CHAD SHARRARD, BRENDAN SMEDICK, ROBERT GORDON, RALEIGH CHAPMAN, JUSTIN DEKRECHEWO, and MARK REVELLO, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

LENNAR CORPORATION and LENNAR MORTGAGE, LLC,

Defendants.
________________________________________/

CLASS ACTION

Consolidated with Nos. 1:26-cv-25731, 1:26-cv-25529, 1:26-cv-25575, 9:26-cv-81016, 1:26-cv-25763, 1:26-cv-25616, 1:26-cv-25820, and 1:26-cv-25939

**JURY TRIAL DEMANDED**

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Brian Keith Davis, Jr., Eric Mullins, Wayne Bensfield, Brendan Smedick, Robert Gordon, Raleigh Chapman, Justin Dekrechewo, and Mark Revello, (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" or "Class Members," as defined below), by and through their undersigned counsel, file this Amended Consolidated Class Action Complaint against Lennar Corporation and Lennar Mortgage, LLC ("Lennar" or "Defendants") and allege the following based on personal knowledge of facts, upon information and belief, and based on the investigation of counsel as to all other matters.

## I. NATURE OF THE ACTION

1. Plaintiffs bring this class action lawsuit against Defendants for their negligent failure to protect and safeguard Plaintiffs' and Class Members' highly sensitive personally identifiable information[1] including their names, contact information, driver's license or other state ID information (collectively "Personally Identifiable Information" or "PII"), health insurance IDs, medical-related information (collectively "Protected Health Information" or "PHI"), and financial account information (collectively with PII and PHI, "Private Information"), culminating in two massive and preventable data breaches (each a "Data Breach" or "Breach," and collectively, the "Data Breaches" or "Breaches"). As a result of Defendants' failure to implement reasonable and necessary data security practices, cybercriminals easily infiltrated Defendants' inadequately protected computer systems and stole the Private Information of Plaintiffs and Class Members.

2. Defendants provide homebuilding and financial services to consumers across the United States.[2] Lennar Corporation is a major U.S. homebuilder and real estate company, while Lennar Mortgage, LLC is an affiliated mortgage-lending business that helps customers finance the purchase of Lennar homes. Lennar Corporation owns, directly or indirectly, 100% of Lennar Mortgage, LLC.

3. Lennar Mortgage, LLC and Lennar Corporation are both part of the Lennar family of companies. According to its website, Lennar is "one of the nation's largest homebuilders, we deliver quality, integrity and unparalleled value to homeowners at every stage of life."[3]

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2] Lennar History, Lennar Corp., https://www.lennar.com/about/history?msockid=0fda91b966a961491b47871367d06091 (last visited Oct. 1, 2026).

4. Plaintiffs and the Class Members are Defendants' current and former customers (including prospective customers). As part of their business practices and in order to provide services to their customers and prospective customers, including Plaintiffs and the Class Members, Defendants collect, store, and maintain customers' Private Information, including that of Plaintiffs and Class Members. Both Defendants store the Private Information on the same servers which both Defendants maintain and control.

5. Defendants suffered two Data Breaches in a short period of time, both through social engineering.

6. The first Breach involved Defendant Lennar Corporation. On or about March 30, 2026, Lennar Corporation became aware that, between approximately March 24, 2026, and March 30, 2026, cybercriminals gained unauthorized access to Defendants' inadequately protected computer system and extracted Plaintiffs' and the Class Members' Private Information stored thereon (the "First Data Breach" and/or "Lennar Corporation Breach").[3]

7. Approximately two months after the First Data Breach, a second Breach occurred involving Defendant Lennar Mortgage, LLC. On or about June 1, 2026, Lennar Mortgage, LLC became aware that, between approximately May 26, 2026, and June 1, 2026, cybercriminals gained unauthorized access again to Defendants' inadequately protected computer system and extracted Plaintiffs' and the Class Members' Private Information stored thereon (the "Second Data Breach" and/or "Lennar Mortgage Breach").[4]

---

[3] Lennar Corp. Notice of Privacy Event, Lennar Corp., https://www.lennar.com/api/images/contentassets/6e00b2d3550a4a4eb93ffa406e92e1e6/lennar-corporation---notice-of-privacy-event.pdf (last visited Oct. 1, 2026).

[4] Lennar Mortgage Notice of Privacy Event, Lennar Mortg., https://pedatadnn.blob.core.windows.net/compliance/Notice_of_Privacy_Event/Lennar_Mortgage_Notice_of_Privacy_Event.pdf (last visited Oct. 1, 2026).

8. Upon information and belief, Defendants have not disclosed publicly what threat actor was involved in either Data Breach.

9. Based on the Defendants' website notices, both Breaches involved nearly identical pieces of sensitive Private Information, including at least: names, contact information, dates of birth, Social Security numbers, passport or other government ID information, driver's license or other state ID information, and financial account information.[5]

10. While the Lennar Corporation Breach started on or about March 24, 2026, Defendants delayed notifying affected individuals until approximately August 14, 2026, ***almost four months later***, when Defendants began mailing Notice Letters to the First Data Breach victims. Upon information and belief, Defendants sent separate letters for those affected by the Lennar Corporation and the Lennar Mortgage Breach. Defendants' unreasonable delay in alerting impacted victims of the Breaches prevented Plaintiffs and Class Members from taking earlier actions to protect themselves against fraud and misuse of their Private Information.

11. Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would safeguard their Private Information from unauthorized disclosure and would implement sufficient cybersecurity safeguards to protect such information, as Defendants were duty-bound to do.

12. Businesses that store and maintain customers' PrivateInformation, like Defendants, owe the individuals to whom the information relates a non-delegable duty to adopt reasonable and appropriate measures to protect it from unauthorized disclosures and unauthorized access by third parties. This duty arises under contract, statutory, regulatory, and common law, industry standards, express promises and representations made to Plaintiffs and Class Members, and because it is

[5] *See supra* notes 3-4.

foreseeable that the exposure of Private Information to unauthorized persons, and especially hackers, will harm the affected individuals.

13. In providing their Private Information to Defendants, Plaintiffs and the Class Members reasonably expected these sophisticated business entities to keep their Private Information confidential and secured from unauthorized disclosures, to use this information for business purposes only, and to disclose it only as authorized. Defendants failed to do so, resulting in the unauthorized disclosure of Plaintiffs' and Class Members' Private Information in the Breach.

14. Defendants failed to adequately protect Plaintiffs' and Class Members' Private Information by failing to maintain reasonable and adequate safeguards to protect customer information.

15. Upon information and belief, Plaintiffs' and Class Members' Private Information is now in the hands of cybercriminals who will continue to use the stolen Private Information for nefarious purposes for the rest of their lives.

16. Due to Defendants' negligent failure to secure and protect Plaintiffs' and Class Members' Private Information, cybercriminals have stolen and obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of tens of thousands of individuals.

17. Now, and for the rest of their lives, Plaintiffs and the Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Even those Class Members who have yet to experience identity theft will have to spend time responding to the Data Breaches and are at an immediate and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breaches.

18. Plaintiffs and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminution of the value of their Private Information, loss of privacy, and additional damages as described below.

19. Plaintiffs bring this action individually and on behalf of the Class, seeking compensatory damages, punitive damages, nominal damages, restitution, injunctive and declaratory relief, reasonable attorneys' fees and costs, and all other remedies this Court deems just and proper.

## II. THE PARTIES

20. Plaintiff **Brian Keith Davis, Jr.** is a resident and citizen of Texas, who purchased a house from Lennar Corporation in 2024 and applied for a mortgage through Lennar Mortgage, LLC. Plaintiff Davis received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that his sensitive personal information was involved in a Breach.

21. Plaintiff **Eric Mullins** is a resident and citizen of Florida, who is a customer of Defendants. Plaintiff Mullins received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that his sensitive personal information was involved in a Breach.

22. Plaintiff **Wayne Bensfield** is a resident and citizen of Arizona, who purchased a house from Lennar Corporation in 2024 and has his mortgage through Lennar Mortgage, LLC. Plaintiff Bensfield received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that his sensitive personal information was involved in a Breach.

23. Plaintiff **Brendan Smedick** is a resident and citizen of Idaho. Plaintiff Smedick received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that his sensitive personal information was involved in a Breach.

24. Plaintiff **Robert Gordon** is a resident and citizen of Florida, who has his mortgage through Lennar Mortgage, LLC. Plaintiff Gordon received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that his sensitive personal information was involved in a Breach.

25. Plaintiff **Raleigh Chapman** is a resident and citizen of Georgia, who obtained a mortgage through Lennar Mortgage, LLC. Plaintiff Chapman received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that his sensitive personal information was involved in a Breach.

26. Plaintiff **Mark Revello** is a resident and citizen of Florida, who purchased a house from Lennar Corporation in 2023 and obtained a mortgage through Lennar Mortgage, LLC. Plaintiff Revello received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that his sensitive personal information was involved in a Breach.

27. Plaintiff **Justin Dekrechewo** is a resident and citizen of Florida, who purchased a home from Lennar Corporation in 2020 and financed the purchase via a mortgage with Lennar Mortgage, LLC. Plaintiff Dekrechewo received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that his sensitive personal information was involved in a Breach.

28. Defendant **Lennar Corporation** is a Delaware corporation with its headquarters and principal place of business located at 5505 Waterford District Drive, Miami, Florida 33126. .

29. Defendant **Lennar Mortgage, LLC** is a Florida limited liability company with its headquarters and principal place of business located at 5505 Waterford District Drive, Suite 502, Miami, Florida 33126. Lennar Mortgage, LLC, builds homes and provides finance options for home buyers. Lennar Mortgage, LLC is a wholly-owned financial services subsidiary of Defendant Lennar Corporation.

30. Upon information and belief, Defendant Lennar Corporation owns Defendant Lennar Mortgage, LLC and the two companies share executive personnel, including the corporate secretary/general counsel.[6]

## III. JURISDICTION AND VENUE

31. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because: (a) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (b) the action is a class action, (c) numerous Class Members and the Plaintiffs are citizens of a different state that is diverse from Defendants, and (d) there are more than 100 Class Members.

32. This Court has personal jurisdiction over Defendants because their principal place of business is in Florida, and the acts and omissions giving rise to Plaintiffs' claims occurred in this State.

33. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants' principal place of business is in this District, and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

[6] *See supra* note 2 ("Lennar's family mortgage company, Eagle Home Mortgage, LLC is renamed to Lennar Mortgage, LLC, further aligning its homebuilding and financial services brands.").

## IV. FACTUAL ALLEGATIONS

### A. Defendants Collected Plaintiffs' and Class Members' Private Information.

34. Defendants provide homebuilding and financial services to consumers across the United States.[7]

35. As part of their business practices and in order to provide services to their customers, Defendants collect, store, and maintain customers' Private Information, including that of Plaintiffs and Class Members. Indeed, as current and former customers of Defendants, Defendants required Plaintiffs and Class Members to share their Private Information in order to obtain services.

36. Defendants obtain, collect, use, and derive benefits from the Private Information of Plaintiffs and Class Members. Defendants use the Private Information they collect to provide construction and financial services, making a profit therefrom. Defendants would not be able to obtain revenue if not for the collection and use of Plaintiffs' and the Class's Private Information.

37. Defendants would be unable to engage in their regular business activities without collecting and aggregating Private Information they know and understand to be sensitive and confidential.

38. Upon information and belief, Defendants made promises and representations to their customers, including Plaintiffs and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

39. Class Members who are current and former customers of Defendants paid or provided services to Defendants, directly or indirectly. Defendants promised data security to their

[7] *See supra* note 2.

customers, and part of the monies Defendants received should have been specifically allocated to data security.

40. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure.

41. Defendants were aware of these duties and obligation. Lennar Corporations' Privacy Policy states, "Lennar maintains commercially reasonable administrative, technical and physical safeguards to secure the confidentiality, integrity and availability of your personal information appropriate to the nature of the personal information we collect."[8]

42. Lennar Mortgage, LLC states in its Privacy Notice that "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[9]

43. Defendants' privacy policies demonstrate that Defendants understood they held sensitive confidential data requiring protection. However, contrary to their representations in their privacy policies, Defendants failed to adopt and implement adequate security safeguards to protect Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure.

44. Plaintiffs and the Class Members reasonably relied on Defendants' promises to keep their Private Information secure, as Defendants intended.

[8] Privacy Policy, Lennar Corp. (May 1, 2026), https://www.lennar.com/privacypolicy.

[9] Privacy Notice, Lennar Mortg. (rev. Aug. 2025), https://pedatadnn.blob.core.windows.net/marketing/donotdelete/pdf/compliance/202508%20-%20Privacy%20Notice.pdf.

45. Plaintiffs and Class Members provided their Private Information, directly or indirectly, to Defendants with reasonable expectations and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

46. Plaintiff and Class Members did not have control over how Defendants stored and maintained their Private Information. Rather, Plaintiff and Class Members were at Defendants' mercy, as Defendants had sole control and authority over their protection of Plaintiffs' and Class Members' Private Information.

47. Upon information and belief, Defendants failed to adopt reasonable and appropriate data security practices and procedures including administrative, physical security, and technical controls to safeguard Plaintiffs' and the Class's Private Information.

48. As a result of collecting and storing the Private Information of Plaintiffs and Class Members for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs' and the Class Members' Private Information from unauthorized access by and disclosure to third parties, and to audit, monitor, and verify the integrity and cybersecurity of their systems storing Private Information.

49. Despite this duty, Defendants failed to implement and maintain reasonable and adequate cyber security, including properly encrypting Private Information and limiting access to Private Information to individuals who need it. As a result, cybercriminals were able to and did access Defendants' vulnerable security network and the unencrypted Private Information of Plaintiffs and the Class Members stored thereon.

**B. Defendants' Data Breaches.**

50. Defendants suffered two separate Data Breaches within approximately two months of one another.

51. The First Data Breach involved Defendant Lennar Corporation. On or about March 30, 2026, Defendant Lennar Corporation became aware that between approximately March 24 and March 30, 2026, cybercriminals gained unauthorized access to Defendants' inadequately protected computer system and extracted Plaintiffs' and the Class Members' Private Information stored thereon.[10]

52. The Second Data Breach involved Defendant Lennar Mortgage, LLC. On or about June 1, 2026, approximately two months after the First Data Breach, Defendant Lennar Mortgage, LLC became aware that between approximately May 26, 2026, and June 1, 2026, cybercriminals gained unauthorized access again to Defendants' inadequately protected computer system and extracted Plaintiffs' and the Class Members' Private Information stored thereon.[11]

53. Upon information and belief, Defendants have not disclosed publicly what threat actor was involved in either Data Breach, or whether the same threat actor was responsible for both Data Breaches.

54. Based on the Defendants' website notices, both Data Breaches involved nearly identical pieces of sensitive Private Information, including at least: names, contact information, dates of birth, Social Security numbers, passport or other government ID information, driver's license or other state ID information, and financial account information and, in some instances, PHI.[12] The same categories of Private Information were exposed in both Data Breaches. This

[10] *See supra* note 3.
[11] *See supra* note 4.
[12] https://www.lennar.com/api/images/contentassets/6e00b2d3550a4a4eb93ffa406e92e1e6/lennar-corporation---notice-of-privacy-event.pdf (last visited Oct. 1, 2026);

underscores that the vulnerabilities exploited in the First Data Breach were not remediated before the occurrence of the Second Data Breach. Moreover, the First Data Breach placed Defendants on actual notice of their data protection deficiencies and the threat of a data breach. The Second Data Breach was therefore entirely foreseeable and preventable, and Defendants' failure to secure their systems in the interval between the two Breaches reflects a conscious disregard of a known and obvious risk to Plaintiffs and Class Members.

55. While the initial Lennar Corporation Breach started on or about March 24, 2026, Defendants unreasonably delayed notifying affected individuals until approximately August 14, 2026, ***almost four months later***, when Defendants began providing Notice Letters to affected individuals. Upon information and belief, Defendants sent separate letters for those affected by the Lennar Corporation and Lennar Mortgage Breaches. Defendants' delay in alerting impacted individuals of the Breaches prevented Plaintiffs and Class Members from taking earlier actions to protect themselves against fraud and misuse of their information.

56. Defendants' delayed notice of the Breaches left impacted individuals with no information regarding critical facts about the Data Breaches, such as details of the root cause of the Breaches, the vulnerabilities exploited, when the Breaches occurred, and the remedial measures taken by Defendants, if any.

57. Defendants failed to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized access and exploitation.

---

https://pedatadnn.blob.core.windows.net/compliance/Notice_of_Privacy_Event/Lennar_Mortgage_Notice_of_Privacy_Event.pdf (last visited Oct. 1, 2026).

58. Defendants failed to timely notify Plaintiffs and Class Members of the Data Breaches.

59. By collecting, storing, and maintaining the Private Information of Plaintiffs and Class Members, Defendants owed a duty to Plaintiffs and Class Members to protect and safeguard their Private Information from unauthorized access and disclosure.

60. Plaintiffs' and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Defendants' deficient security for customer data caused and allowed criminals to target and take files containing Plaintiffs' and Class Members' inadequately protected, unencrypted Private Information in Defendants' possession through the Data Breaches.

61. Because Defendants had a duty to protect Plaintiffs' and Class Members' Private Information, Defendants should have known through readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information, including Defendants' First Data Breach. Thus, Defendants had a duty to ensure that customers' Private Information, stored within their networks and systems, were secured and protected from unauthorized disclosures to third parties.

62. Defendants could and should have prevented the Data Breaches by properly securing and encrypting the files and servers containing the Private Information of Plaintiffs and Class Members. These Data Breaches could have been prevented through industry standard network segmentation and encryption of confidential information. Further, the Data Breaches could have been likely prevented had Defendants utilized appropriate malware prevention and detection technologies, including network monitoring and event logging.

63. Plaintiffs further believe that their Private Information and that of Class Members, was subsequently sold on the dark web following one or both Data Breaches, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

64. All in all, Defendants failed to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized access and exploitation.

65. Defendants' actions represent a flagrant disregard of the rights of Plaintiffs and the Class, both as to privacy and property.

66. As such, Plaintiffs and the Class have suffered concrete harm and continue to be at an imminent and impending risk of identity theft and fraud.

### C. Cyber Criminals Have Already Used and Will Continue to Use Plaintiffs' and Class Members' Private Information to Defraud Them.

67. Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breaches can and will be used in a variety of ways by criminals to exploit Plaintiffs and Class Members and to profit from their misfortune.

68. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[13]

69. For example, with the Private Information stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, obtain medical services, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal

[13] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited Oct. 1, 2026).

government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[14]

70. These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

71. As described in this Complaint, several Plaintiffs have already suffered from actual misuse of their Private Information compromised in the Data Breaches. Those Plaintiffs, the other Plaintiffs, and the Class will remain at serious risk of imminent harm from future misuse because the misuse has already begun.

72. When cybercriminals manage to steal personally sensitive data like Social Security numbers—as they did here—there is no limit to the amount of fraud to which Plaintiffs and Class Members are exposed.

73. Social Security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[15]

---

[14] *See, e.g.*, Nikkita Walker, *What Can Someone Do With Your Social Security Number?*, Credit.com (Oct. 19, 2023), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[15] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/media/legacy/post_16219/Dark-Web-Monitoring.pdf (emphasis added).

74. PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[16]

75. The Data Breaches at issue here were targeted and financially motivated, as the only reason cybercriminals go through the trouble of hacking entities like Defendants is to steal the highly sensitive information they maintain, which can be exploited and sold for use in the kinds of criminal activity described herein.

76. A Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[17]

77. Identity theft experts advise victims of data breaches: "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[18]

78. These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to PII, ***they will use it***.[19]

79. Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data

[16] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/products/gao-07-737.

[17] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, PGMag (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[18] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/media/legacy/post_16219/Dark-Web-Monitoring.pdf.

[19] Ari Lazarus, *How fast will identity thieves use stolen info?*, Military Consumer (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

> have been sold or posted on the Web, fraudulent use of that information **may continue for years**. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

80. For instance, with stolen Social Security numbers, which were exposed in the Breaches, criminals can and do open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[21]

81. Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[22]

82. The unfortunate truth is the full scope of the harm has yet to be realized. There may be a time lag between when harm occurs and when it is discovered, and also between when Private Information is stolen and when it is used.

83. Plaintiffs and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Defendants' negligence.

84. Furthermore, identity monitoring services only alert someone to the fact that they have already been the victim of identity theft—it does not prevent identity theft.[23]

85. Nor can an identity monitoring service remove personal information from the dark web.[24]

---

[20] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/products/gao-07-737 (emphasis added).

[21] *See* Nikkita Walker, *What Can Someone Do With Your Social Security Number?*, Credit.com (Oct. 19, 2023), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[22] *Guide for Assisting Identity Theft Victims*, Federal Trade Commission (Sept. 2013), https://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

[23] *See* Kayleigh Kulp, *Credit monitoring services may not be worth the cost*, CNBC (Nov. 30, 2017, 9:00 AM), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

[24] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/media/legacy/post_16219/Dark-Web-Monitoring.pdf.

86. "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[25]

87. As a direct and proximate result of the Data Breaches, Plaintiffs and the Class have been damaged and placed at an imminent and continuing increased risk of harm from fraud and identity theft. Plaintiffs and the Class must now take—and have taken—the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and medical records for unauthorized activity for years to come.

88. Even more serious is the identity restoration that Plaintiffs and other Class Members must go through, which can require spending countless hours filing police reports, filling out IRS forms, completing FTC checklists and Department of Motor Vehicle driver's license replacement applications, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps Plaintiff and the Class must take.

89. Plaintiffs and the Class have experienced or will experience the following concrete and particularized harms for which they are entitled to compensation, including:

a. Actual identity theft;

b. Trespass, damage to, and theft of their personal property, including their Private Information;

c. Improper disclosure and theft of their Private Information;

[25] *Id.*

d. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

e. Loss of privacy suffered because of the Data Breaches, including the harm of knowing cybercriminals have their Private Information;

f. Ascertainable losses in the form of time taken to respond to identity theft, including lost opportunities and lost wages from uncompensated time off from work;

g. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breaches;

h. Ascertainable losses in the form of diminution of the value of Plaintiffs' and Class Members' Private Information, for which there is a well-established and quantifiable national and international market;

i. The loss of use of and access to their credit, accounts, and/or funds;

j. Damage to their credit due to fraudulent use of their Private Information; and/or

k. Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

90. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendants, is protected from further breaches through the implementation of industry standard security measures and safeguards. Defendants have shown themselves wholly incapable of protecting Plaintiffs' and Class Members' Private Information.

91. Plaintiffs and Class Members also have an interest in ensuring that their Private Information is removed from all Defendants' servers, systems, and files. Indeed, Defendants have no legitimate business need to retain Private Information for many Plaintiffs and Class Members.

92. Plaintiffs and Class Members are desperately trying to mitigate the damages Defendants caused them.

93. Given the kind of Private Information Defendants made accessible to hackers, however, Plaintiffs and the Class are certain to incur additional damages. Because identity thieves have their Private Information, Plaintiffs and Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[26]

94. None of this should have happened because the Data Breach was entirely preventable.

**D. Defendants were Aware—or Should Have Been Aware—of the Risk of Cyberattacks.**

95. In electing to store Plaintiffs' and the Class Members' Private Information together in one place on an Internet-accessible platform, Defendants created a treasure trove for cybercriminals. Defendants knew or should have known that cybercriminals would attempt to obtain this gold-mine of Private Information based on publicly available information, warnings from governmental oversight authorities, and rules and guidelines in place for entities like Defendants.

96. Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of

[26] *What happens if I change my Social Security number?*, Lexington Law (Aug. 10, 2022), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

some of the biggest cybersecurity breaches: Target,[27] Yahoo,[28] Marriott International,[29] Chipotle, Chili's, Arby's,[30] and others.[31]

97. The number of data breach victims surpassed one billion for the first half of 2024, according to the Identity Theft Resource Center.[32]

98. Defendants should certainly have been aware, and indeed were aware, that they were at risk of a data breach that could expose the PII that they collected and maintained.

99. Defendants were clearly aware of the risks they were taking and the harm that could result from inadequate data security but threw caution to the wind.

100. Defendants (a) had deficient security measures to protect the Private Information they stored for their current and former customers; (b) were aware or should have been aware of the risk of harm to their customers in the event of a data breach; (c) knew or should have known of the foreseeable harms caused by cyberattacks; and (d) negligently failed to safeguard Plaintiffs' and Class Members' Private Information.

---

[27] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[28] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[29] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/ (last visited Feb. 6, 2026).

[30] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018, 12:58 PM), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[31] *See, e.g.*, Michael Hill and Dan Swinhoe, *The 20 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Jun. 12, 2025), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

[32] Betty Lin-Fisher, *There are 1 billion victims of data breaches so far this year. Are you one of them?*, USA Today (July 18, 2024), https://www.usatoday.com/story/money/2024/07/18/data-breach-what-to-do/74441060007/.

101. Despite their assurances to customers regarding safeguarding Private Information, Defendants negligently failed to implement adequate security measures to safeguard the Private Information of Plaintiffs and Class Members.

**E. Defendants Failed to Comply with FTC Guidelines and Industry Standards for Cybersecurity.**

102. Data breaches are preventable.[33] "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[34] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[35]

103. Most reported data breaches "are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[36]

104. Here, many failures laid the groundwork for the Data Breaches.

105. The FTC has published guidelines that establish reasonable data security practices for businesses.[37]

---

[33] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, Data Breach and Encryption Handbook (Lucy Thompson, ed., 2012), https://lawcat.berkeley.edu/record/394088.

[34] *Id.* at 17.

[35] *Id.* at 28.

[36] *Id.*

[37] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

106. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[38]

107. The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information ***that is no longer needed***; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.[39]

108. The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[40]

109. According to information and belief, Defendants failed to follow reasonable and necessary industry standards to prevent the Breaches, including the FTC's guidelines. This is a violation of Section 5 of the Federal Trade Commission Act ("FTC Act").

110. Upon information and belief, Defendants also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in cybersecurity readiness.

111. Because Defendants collected and stored health-related information alongside other Private Information, the data security safeguards recognized under the HIPAA Security Rule and the HITECH Act reflect widely recognized and specific measures of reasonable data security for

---

[38] *Id.*
[39] *Id.*
[40] *Id.*

organizations that hold sensitive personal and health-related information. Plaintiffs do not allege that Defendants are "covered entities" or "business associates" under HIPAA, and Plaintiffs assert no claim under HIPAA or the HITECH Act; rather, Plaintiffs allege these standards solely as evidence of the reasonable measures Defendants failed to adopt and of the standard of care applicable to Defendants' handling of Plaintiffs' and Class Members' Private Information.

112. As explained by the Federal Bureau of Investigation ("FBI"), "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[41]

113. To prevent and detect the attacks here, Defendants could and should have taken, as recommended by the FBI, the following measures:

- Implemented an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enabled strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scanned all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configured firewalls to block access to known malicious IP addresses.

[41] *See How to Protect Your Networks from RANSOMWARE* at 3, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Patched operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Managed the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configured access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write permission for those files, directories, or shares.
- Disabled macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implemented Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Considered disabling Remote Desktop protocol (RDP) if it is not being used.
- Used application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Executed operating system environments or specific programs in a virtualized environment.
- Categorized data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[42]

114. Upon information and belief, Defendants failed to many, if not all, of the above.

115. To prevent and detect ransomware attacks, Defendants could and should have instructed their employees, as recommended by the United States Cybersecurity & Infrastructure Security Agency, to take the following measures:

- **Updated and patched your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.
- **Used caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).
- **Opened email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

---

[42] *Id.* at 3–4.

- **Kept your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it.
- **Verified email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
- **Used and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[43]

116. In addition, to prevent and detect the Data Breaches, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Harden internet-facing assets**
  - Apply latest security updates

[43] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (rev. Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (internal citations omitted).

- Use threat and vulnerability management
- Perform regular audits

- **Thoroughly investigate and remediate alerts.**
  - Prioritize and treat commodity malware infections as potential full compromise of the system
- **Include IT professionals in security discussions.**
  - Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely
- **Build and maintain credential hygiene**
  - Use multifactor authentication or network level authentication and enforce strong, randomized, just-in-time local administrator passwords
- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events
- **Harden infrastructure**
  - Utilize Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection

- Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications[44]

117. Given that Defendants were storing the Private Information of tens of thousands of individuals, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks. However, because Defendants failed to do so, an unknown third-party was able to gain access to Defendants' inadequately secured network and systems and exfiltrate the sensitive Private Information of Plaintiffs and Class Members.

118. Specifically, among other failures, Defendants had far too much confidential unencrypted information held on their systems. Such Private Information should have been segregated into an encrypted system.[45]

119. Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.[46]

120. The FTC has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[47] Rather than following this basic standard of care, Defendants kept thousands of current and former customers' unencrypted Private Information on their inadequately secured systems indefinitely.

---

[44] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT Intelligence (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[45] *See* Adnan Raja, *How to Safeguard Your Business Data With Encryption*, FORTRA (Aug. 14, 2018), https://www.fortra.com/blog/how-safeguard-your-business-data-encryption.

[46] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[47] *Id.* at 6.

121. In sum, the Data Breaches could have been easily prevented through standard practices like the use of industry standard network segmentation and encryption of all Private Information—which Defendants negligently failed to do.

122. Further, the scope of the Data Breaches could have been dramatically reduced had Defendants utilized proper record retention and destruction practices—but Defendants negligently did no such thing.

**F. Common Injuries and Damages.**

123. As a result of Defendants' ineffective and inadequate data security practices, the Data Breaches, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breaches; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breaches; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

**G. Loss of Time to Mitigate the Risks of Fraud and Identity Theft.**

124. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in these

Data Breaches, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

125. Due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm. Identity theft protection and credit monitoring services are reasonable and necessary for Plaintiffs and Class Members to protect themselves against fraud and identity theft. Plaintiffs and Class Members will have to pay for these services for the rest of their lives now that their Private Information has been accessed and exposed in Defendants' Breaches.

126. Plaintiffs and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing freezes and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports.

127. These efforts are consistent with the steps that the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

128. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason,

Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendants' conduct that caused the Data Breaches.

### H. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary.

129. To date, Defendants have done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breaches.

130. In their Notice Letters, Defendants offered Plaintiffs and the Class Members two years of credit monitoring services. But this is just a drop in the bucket compared to the lifetime of credit monitoring that Plaintiffs and the Class Members will need to protect themselves from the continuing harms resulting from the Data Breaches.

131. Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

132. By accessing and obtaining the Private Information in the Breaches, hackers have everything they need to commit fraud and identity theft.

133. Such fraud may be undetected until debt collection calls commence months, or even years later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

134. Furthermore, the information accessed and disseminated in the Data Breaches is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.[48]

135. The Private Information disclosed in this Data Breaches is impossible to "close" and difficult, if not impossible, to change.

136. Consequently, Plaintiffs and Class Members are at present and ongoing risk of fraud and identity theft for many years into the future.

137. The retail cost of credit monitoring and identity theft monitoring can reach $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breaches. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

### I. Plaintiffs' Individual Experiences

***Plaintiff Brian Keith Davis, Jr.***

138. Plaintiff Brian Keith Davis, Jr. is a customer of Lennar Corporation.

139. In or about September 2024, Plaintiff Davis purchased a Lennar-built home from Lennar Corporation and was required to provide sensitive personal information, including his name, contact information, date of birth, and Social Security number. However, Plaintiff Davis did not finance his home purchase through Lennar Mortgage, LLC. As such, Plaintiff Davis does not know how his Private Information came to be held in Lennar Mortgage, LLC's systems. Upon information and belief, Lennar Mortgage, LLC obtained Plaintiff Davis's Private Information in

[48] Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/ (last visited Sept. 30, 2026).

connection with a financing inquiry or application Plaintiff does not recall making, by transfer from Lennar Corporation or another Lennar affiliate in connection with his home purchase, or from some other source. Lennar Mortgage, LLC has never explained it to him. What is not in doubt is that Lennar Mortgage, LLC held that information and failed to protect it.

140. Plaintiff Davis received a letter from Defendants dated August 14, 2026 informing him that his Private Information had been compromised as part of the Data Breach.

141. The mailing address Lennar maintained in its records for Plaintiff Davis was a former address in Louisiana, at which Plaintiff Davis no longer resides. Lennar Mortgage, LLC addressed its breach notice to that outdated address rather than to Plaintiff Davis's current residence.

142. That Defendants held the complete identity file of a person who never became their borrower is itself a failure of reasonable data security. Reasonable practice, and the Safeguards Rule that binds Defendants, require an institution to maintain a current inventory of the data they hold, to review their retention policy periodically in order to minimize the unnecessary retention of personal information, and to dispose of customer information securely once it is no longer needed for any legitimate business purpose.

143. Plaintiff Davis purchased his home in September 2024 from Lennar Corporation and financed it through another lender. Whatever business purpose Defendants may once have had for holding his Social Security number and date of birth had been exhausted well before May 2026, and Lennar Mortgage, LLC retained that information anyway. Had Lennar Mortgage, LLC limited its holdings to what it had a present business reason to maintain, Plaintiff Davis's Private

Information would not have been in the systems the unauthorized actor reached, and Plaintiff Davis would not have been exposed at all.[49]

144. Plaintiff Davis reasonably understood that a portion of the funds he paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

145. Plaintiff Davis's Private Information was not merely exposed; it was used against him. On or about May 27, 2026, one day after the unauthorized actor first obtained access to Defendants' systems, Plaintiff Davis was contacted by a person holding himself out as "Louis Sanchez, Account Manager, Department of Loss Mitigation" of Lennar. Upon information and belief, no such person works for Lennar. The impersonation was credible to Plaintiff Davis because the caller presented himself as a representative of Lennar, already possessed Plaintiff Davis's contact information and personal details, and spoke with knowledge of that home, precisely the categories of information Lennar held and failed to protect.

146. Specifically, the impersonator told Plaintiff Davis that "your loan modification request has been reviewed and approved," and warned that "[t]imely completion of the above payments is required to proceed successfully through the loan modification process." He first instructed Plaintiff Davis to send funds by Zelle, then directed him to withdraw cash at an automated teller machine, and ultimately directed him to complete the payment at a Walmart location. Each of these instructions are indicative of consumer fraud. Plaintiff Davis, believing he was dealing with his mortgage servicer and that his loan modification depended on it, complied. He paid an initial amount of approximately $1,100 and a second amount in excess of $800, for a total loss of approximately $2,000.

[49] 16 C.F.R. § 314.4(c)(2), (c)(6) (2026).

147. Because the impersonator had convinced Plaintiff Davis that his home was in jeopardy, Plaintiff Davis, fearing that he was about to lose his first home, paid a $300 deposit to secure a rental apartment. That expenditure was a reasonable and foreseeable response to the fraud that Lennar's failure to safeguard Plaintiff Davis's Private Information made possible.

148. Plaintiff Davis did not immediately understand that he had been defrauded. The caller held himself out as the loss-mitigation department of Lennar, represented that a loan modification had been reviewed and approved, and spoke with apparent command of Plaintiff's personal information and property. Plaintiff Davis believed for more than two months that the payments he had been directed to make were legitimate. He learned otherwise on or about August 3, 2026, when he was contacted by Rocket Mortgage, the lender that actually holds and services his mortgage loan, and understood for the first time that the loan-modification approval and the payment demands had come from no one with any authority over his loan. The concealment was made possible by the very information Lennar failed to protect.

149. Plaintiff Davis also lost income. From approximately August 4 through August 7, 2026, the days immediately following his realization that he had been defrauded, Plaintiff Davis was unable to work as he dealt with the consequences of the fraud and attempted to protect himself and his home. To keep money coming in during that period, Plaintiff Davis was forced to take on delivery work through DoorDash. Those lost wages, and the time Plaintiff Davis diverted from his ordinary occupation, are direct and foreseeable consequences of Lennar's failure to safeguard his Private Information.

150. Additionally, immediately following the Data Breaches, Plaintiff Davis experienced a marked and sustained increase in the volume of unsolicited spam emails, text messages, and telephone calls he received, well beyond anything he had experienced before. Upon

information and belief, that activity is a direct result of the Data Breaches and the dissemination of Plaintiff Davis's Private Information.

151. Plaintiff Davis received Defendants' Notice of Data Breach letter on or about August 14, 2026. The letter was addressed to Plaintiff Davis at a former address in Louisiana, an address at which Plaintiff Davis no longer resided, rather than at his current residence in Texas. The letter notified Plaintiff Davis that his Private Information had been accessed and taken by an unauthorized third party in the Data Breach, and identified the information involved as his name, contact information, date of birth, and Social Security number.

152. The only remediation Defendants offered was 24 months of identity monitoring. That offer is inadequate on its face. A Social Security number cannot be changed or reissued in the ordinary course, and the risk of its criminal misuse does not expire after 24 months; Plaintiff Davis's date of birth and Social Security number will identify him for the rest of his life. Identity monitoring is moreover a detection tool, not a prevention tool; it tells a victim after the fact that his identity has been used and by the time Defendants offered Plaintiff Davis anything at all, criminals had already used the information Lennar held to steal approximately $2,000 from him.

153. Prior to the Data Breaches, to the best of his recollection, Plaintiff Davis had never been the victim of a data breach, had never received a data breach notification letter of any kind, and had never been the victim of identity theft or fraud. Since the Data Breaches, Plaintiff Davis has spent substantial time researching the incident, dealing with the fraud committed against him, gathering and preserving his payment receipts, reviewing his account statements, and taking other steps to secure his accounts and protect himself from further harm. Defendants' letter directed Plaintiff Davis to remain vigilant and to monitor his accounts and credit reports for suspicious activity, burdens Defendants' conduct shifted onto Plaintiff Davis. Plaintiff Davis must now obtain

and review his credit reports on a recurring basis, and he anticipates spending additional time and money on an ongoing basis to mitigate the harms caused by the Data Breaches.

154. The Data Breaches and the fraud they enabled have caused Plaintiff Davis substantial fear, worry, anxiety, and emotional distress. That fear was not abstract or self-generated: it was manufactured by criminals using information Defendants failed to protect, and it was credible to Plaintiff Davis precisely because those criminals knew things about his home and his loan that only Defendants and Plaintiff Davis should have known. Plaintiff Davis remains anxious and frightened knowing that his Social Security number and date of birth are now in criminal hands, cannot be changed, and will expose him to a continuing risk of identity theft and fraud for the rest of his life.

155. Plaintiff Davis greatly values his privacy and is careful about sharing his sensitive Private Information, and he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Davis would not have provided his Private Information to Defendants, or permitted it to be transferred to or retained by Defendants, had he known that Defendants would not implement proper data security protocols to protect his Private Information.

156. Plaintiff Davis has therefore suffered actual injury as a direct and proximate result of the Data Breach, including: (a) approximately $2,000 in out-of-pocket losses paid to criminals who used the compromised information to impersonate Lennar; (b) a $300 out-of-pocket expenditure incurred in reasonable reliance on the fraudsters' threat to his home; (c) lost wages from work missed responding to the fraud; (d) lost time spent mitigating the consequences of the Data Breaches; (e) damage to and diminution in the value of his Private Information, a form of property that Defendants obtained from him; (f) violation of his privacy rights; and (g) present,

imminent, and impending injury arising from the increased risk of identity theft and fraud.

***Plaintiff Wayne Bensfield***

157. Plaintiff Wayne Bensfield purchased a house from Lennar Corporation in 2024 and has his mortgage through Lennar Mortgage, LLC. Through this relationship, Plaintiff Bensfield provided his sensitive Private Information to Defendants.

158. Plaintiff Bensfield received a Notice Letter from Defendant Lennar Mortgage, LLC postmarked August 14, 2026, informing him that at least his name, contact information, date of birth, and Social Security number were included in one of the Breaches.

159. Plaintiff Bensfield entrusted his Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would keep his Private Information secure from unauthorized access.

160. By soliciting and accepting Plaintiff Bensfield's Private Information, Defendants agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

161. Plaintiff Benfield reasonably understood that a portion of the funds he paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

162. Plaintiff Bensfield would not have provided his Private Information to Defendants had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

163. Upon information and belief, Defendants was in possession of Plaintiff Bensfield's Private Information before, during, and after the Data Breaches.

164. As a result, Plaintiff Bensfield was injured by Defendants' Data Breaches.

165. In response to the Data Breaches, upon information and belief, Plaintiff Bensfield made reasonable efforts to mitigate the impact of the Data Breaches, including, but not limited to researching the Data Breaches, reviewing and monitoring his accounts for fraudulent activity, and

reviewing his credit reports. Plaintiff Bensfield estimates he spends at least an hour every week responding to the Data Breach by, for example, monitoring his accounts for unusual activity, dealing with the spam messages he receives.

166. Plaintiff Bensfield will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

167. Plaintiff Bensfield places significant value in the security of his Private Information and does not readily disclose it. Plaintiff Bensfield entrusted Defendants with his Private Information with the understanding that Defendants would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Private Information would not be compromised.

168. Because of the Data Breaches, there is no doubt Plaintiff Bensfield's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Bensfield and the Class are at an imminent risk of identity theft and fraud.

169. After the Data Breaches, Plaintiff Bensfield noticed a significant uptick in spam emails, receiving at least 15 spam emails per day. Some of this spam has concerned financial offers he never inquired about. Upon information and belief, Defendants had Plaintiff Bensfield's phone number and email as part of their business practices and maintained it before during, and after the Breaches. Plaintiff Bensfield did not receive this amount of spam emails per day prior to the Data Breaches which indicates that his email address and Private Information has already been misused. Plaintiff Bensfield attributes these unsolicited communications to the Data Breaches based on

temporal proximity to the Data Breaches, his careful handling of his Private Information, and the fact that this level spam emails are atypical in Plaintiff Bensfield's experience.

170. Plaintiff Bensfield suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

171. Plaintiff Bensfield suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants was required to adequately protect and safeguard against unauthorized disclosure.

172. Due to Defendants' Breach, Plaintiff Bensfield will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendants' breach of duty to maintain Plaintiff Bensfield's highly sensitive Private Information secure and protected against unauthorized disclosure.

173. Plaintiff Bensfield's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

174. Knowing that thieves intentionally targeted and accessed his Private Information, has caused Plaintiff Bensfield great anxiety beyond mere worry.

175. The Data Breaches have caused Plaintiff Bensfield to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in notifying him of the fact that his Private Information was accessed and/or acquired by criminals as a result of the Data Breaches.

176. Plaintiff Bensfield has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

177. As a direct and traceable result of the Data Breaches, Plaintiff Bensfield suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendants did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff Bensfield; and (vii) other economic and non-economic harm.

178. Plaintiff Bensfield has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for ***years*** to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breaches.

179. Plaintiff Bensfield has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Bensfield's Private Information will be wholly unprotected and at-risk of future data breaches.

180. Plaintiff Bensfield did not consent to Defendants' release of his Private Information to unauthorized third parties, and Plaintiff Bensfield would not have permitted Defendants to collect, store, or maintain his Private Information had he known of Defendants' deficient cybersecurity practices.

***Plaintiff Brendan Smedick***

181. Plaintiff Smedick's Private Information was collected, stored, and maintained by Defendants in connection with its residential mortgage lending business. Defendants confirmed in their written notice to Plaintiff Smedick that it maintained Plaintiff Smedick's sensitive personal information and that this information may have been affected by the Data Breach.

182. The Private Information that Defendants collected, stored, and maintained concerning Plaintiff Smedick included his name, contact information, date of birth, and Social Security number. Plaintiff Smedick reasonably expected that Defendants would safeguard that information and would not permit it to be accessed by unauthorized third parties.

183. Plaintiff Smedick reasonably understood that a portion of the funds he paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

184. On or about August 14, 2026, Lennar Mortgage, LLC mailed a written notice to Plaintiff Smedick at his home address in Kuna, Idaho, informing him that his sensitive personal information, including his name, contact information, date of birth, and Social Security number, may have been affected by one of the Data Breaches.

185. Since the Data Breaches, Plaintiff Smedick has experienced two separate incidents of fraudulent, unauthorized charges to financial accounts associated with him, and he has been required to devote time and effort to identifying, reporting, and disputing those unauthorized charges.

186. Plaintiff Smedick has at all times taken reasonable steps to protect and maintain the confidentiality of his Private Information, and he did not publish or otherwise make that information available to unauthorized third parties.

187. Plaintiff Smedick has spent, and will continue to spend, time and effort responding to the Data Breaches, including monitoring his financial accounts, credit files, and incoming communications for indicia of identity theft, reviewing and disputing unauthorized activity, and considering and evaluating additional protective measures such as enrolling in credit monitoring services and placing fraud alerts or credit freezes.

188. Plaintiff Smedick has suffered, and will continue to suffer, anxiety, concern, and emotional distress arising from the loss of control over his Private Information and from the imminent and ongoing risk that his Private Information will be used to commit identity theft or fraud against him.

189. Plaintiff Smedick did not consent to Defendants' release of his Private Information to unauthorized third parties, and Plaintiff Smedick would not have permitted Defendants to collect, store, or maintain his Private Information had he known of Defendants' deficient cybersecurity practices.

***Plaintiff Robert Gordon***

190. Plaintiff Robert Gordon has had a mortgage directly through Lennar Mortgage, LLC since 2023. His loan was not originated by another lender and later acquired by Lennar Mortgage, LLC. Through this relationship, Plaintiff Gordon provided his sensitive Private Information to Defendants.

191. Plaintiff Gordon received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that an unauthorized party had accessed certain Lennar Mortgage, LLC systems between May 26, 2026 and June 1, 2026, and that his sensitive personal information, including his name, contact information, date of birth, and Social Security number, may have been affected.

192. Plaintiff Gordon entrusted his Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would keep his Private Information secure from unauthorized access.

193. Plaintiff Gordon reasonably understood that a portion of the funds he paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

194. By soliciting and accepting Plaintiff Gordon's Private Information, Defendants agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

195. Plaintiff Gordon would not have provided his Private Information to Defendants had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

196. Upon information and belief, Defendants were in possession of Plaintiff Gordon's Private Information before, during, and after the Data Breach.

197. As a result, Plaintiff Gordon was injured by Defendants' Data Breach.

198. In response to the Data Breach, Plaintiff Gordon enrolled in the two years of complimentary identity monitoring offered by Lennar Mortgage, LLC and continues to monitor for suspicious activity. He has spent time addressing and monitoring the consequences of the Data Breach.

199. Plaintiff Gordon will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

200. Plaintiff Gordon places significant value in the security of his Private Information and does not readily disclose it. Plaintiff Gordon entrusted Defendants with his Private Information with the understanding that Defendants would keep his information secure and would employ

reasonable and adequate data security measures to ensure that his Private Information would not be compromised.

201. Because Plaintiff Gordon's sensitive personal information may have been affected by the Data Breach, he faces an increased risk of identity theft and fraud and must remain vigilant for potential misuse of that information.

202. After receiving the Notice Letter, Plaintiff Gordon experienced a large influx of spam email, which he estimates at approximately 25 to 50 messages per day, and he provided example screenshots. Plaintiff Gordon did not receive this volume of spam email before the notice and attributes the increase to the Data Breach based on its timing and the atypical volume of the messages.

203. Plaintiff Gordon suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

204. Plaintiff Gordon suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants was required to adequately protect and safeguard against unauthorized disclosure.

205. Although Plaintiff Gordon has not identified any financial fraud to date, he enrolled in the complimentary identity monitoring offered by Lennar Mortgage, LLC and expects to continue monitoring because the notice states that his name, contact information, date of birth, and Social Security number may have been affected.

206. Plaintiff Gordon's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

207. The potential exposure of his Private Information and the need for continued monitoring have caused Plaintiff Gordon anxiety beyond mere worry.

208. The Data Breach has caused Plaintiff Gordon to suffer anxiety and concern regarding the security and potential misuse of his Private Information.

209. Plaintiff Gordon has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

210. As a direct and traceable result of the Data Breach, Plaintiff Gordon has suffered actual injury and damages, including, but not limited to: (i) lost time spent responding to and monitoring the consequences of the Data Breach; (ii) loss of privacy associated with the potential exposure of his Private Information; (iii) anxiety and concern regarding possible misuse of his Private Information; (iv) a substantial increase in spam email; (v) diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff Gordon; and (vi) present and continuing exposure to an increased risk of identity theft and fraud. Plaintiff Gordon has not identified any financial fraud to date.

211. Plaintiff Gordon has been and will continue to be at a heightened risk of future identity theft and fraud because the information identified in the Notice Letter includes persistent identifiers such as his date of birth and Social Security number, even though he has not identified financial fraud to date.

212. Plaintiff Gordon has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Gordon's Private Information will be wholly unprotected and at-risk of future data breaches.

213. Plaintiff Gordon did not consent to Defendants' release of his Private Information to unauthorized third parties, and Plaintiff Gordon would not have permitted Defendants to collect, store, or maintain his Private Information had he known of Defendants' deficient cybersecurity practices.

***Plaintiff Eric Mullins***

214. Plaintiff Eric Mullins is a customer of Lennar Mortgage, LLC. Through this relationship, Plaintiff Mullins provided his sensitive Private Information to Defendants.

215. Plaintiff Mullins received a Notice Letter from Lennar Mortgage, LLC dated August 14, 2026, informing him that an unauthorized party used sophisticated social-engineering tactics to access certain Lennar Mortgage, LLC systems between May 26, 2026 and June 1, 2026, and that his sensitive personal information, including his name, contact information, date of birth, and Social Security number, had been compromised.

216. Plaintiff Mullins entrusted his Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would keep it secure from unauthorized access and disclosure.

217. Plaintiff Mullins reasonably understood that a portion of the funds he paid to Defendants would be used to provide adequate cybersecurity and protection for his Private Information. He would not have provided his Private Information to Defendants had he known that Defendants would fail to implement reasonable data-security measures.

218. After the Data Breach, Plaintiff Mullins received a dark-web alert indicating that his personal information had been detected on the dark web. This alert confirms that his Private Information is exposed to unauthorized persons and at risk of misuse.

219. Following the Data Breach, Plaintiff Mullins received unauthorized-activity notices from Apple related to his accounts. He has been required to review those notices and take steps to determine whether and how his accounts or Private Information were being misused.

220. Since the Data Breach, Plaintiff Mullins has experienced an increase in unsolicited spam telephone calls and spam emails beyond the volume he received before the incident. Plaintiff Mullins attributes this increase to the Data Breach based on its timing, the affected contact information identified in the Notice Letter, and the accompanying dark-web and unauthorized-activity alerts.

221. In response to the Data Breach and subsequent alerts, Plaintiff Mullins enrolled in credit monitoring and has spent time and effort reviewing notices, monitoring his financial and online accounts, addressing increased spam communications, and taking steps to protect himself from further misuse of his Private Information.

222. Plaintiff Mullins will be required to continue monitoring his credit reports, financial accounts, and online accounts because the information identified in the Notice Letter includes persistent identifiers such as his date of birth and Social Security number. The monitoring and response time he has expended cannot be recaptured.

223. Plaintiff Mullins suffered actual injury from the unauthorized access to and disclosure of his Private Information, including loss of privacy and loss of control over that information.

224. Plaintiff Mullins suffered actual injury in the form of damage to and diminution in the value of his Private Information, a form of intangible property that Defendants were required to protect against unauthorized access and disclosure.

225. As a direct and traceable result of the Data Breach, Plaintiff Mullins has suffered actual injury and damages, including, but not limited to: (i) lost time and effort responding to the Data Breach and monitoring for unauthorized activity; (ii) loss of privacy and control over his Private Information; (iii) increased spam calls and emails; (iv) unauthorized-activity notices; (v) damage to and diminution in the value of his Private Information; and (vi) present and continuing exposure to an increased risk of identity theft and fraud.

226. Plaintiff Mullins has been and will continue to be at a heightened risk of future identity theft and fraud because his name, contact information, date of birth, and Social Security number may have been affected and because he received a dark-web alert and unauthorized-activity notices following the Data Breach.

227. Plaintiff Mullins did not consent to Defendants' release of his Private Information to unauthorized third parties, and he would not have permitted Defendants to collect, store, or maintain his Private Information had he known of Defendants' deficient cybersecurity practices.

228. Plaintiff Mullins has a continuing interest in ensuring that his Private Information remaining in Defendants' possession is protected and safeguarded from future data breaches. Plaintiff Mullins's Private Information will continue to be at risk of imminent future harm absent Court intervention.

***Plaintiff Raleigh Chapman***

229. Plaintiff Raleigh Chapman is a customer of Lennar Mortgage, LLC. Through this relationship, Plaintiff Chapman provided his sensitive Private Information to Defendants.

230. Plaintiff Chapman received a Notice Letter from Lennar Mortgage, LLC dated August 14, 2026, informing him that an unauthorized party used sophisticated social-engineering tactics to access certain Lennar Mortgage, LLC systems between May 26, 2026 and June 1, 2026,

and that his sensitive personal information, including his name, contact information, date of birth, and Social Security number, may have been affected.

231. Plaintiff Chapman entrusted his Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would keep it secure from unauthorized access and disclosure. He would not have provided his Private Information to Defendants had he known that Defendants would fail to implement reasonable data-security measures.

232. After the Data Breach, Plaintiff Chapman received an alert through AOL indicating that his personal information had been detected on the dark web. This alert demonstrates that his Private Information is exposed to unauthorized persons and at risk of misuse.

233. Since the Data Breach, Plaintiff Chapman has experienced an increase in unsolicited spam telephone calls beyond the volume he received before the incident. Plaintiff Chapman attributes the increase to the Data Breach based on its timing, the affected contact information identified in the Notice Letter, and the dark-web alert he received.

234. Plaintiff Chapman has not identified any fraudulent transactions or other financial fraud to date.

235. Plaintiff Chapman suffered actual injury from the unauthorized access to and disclosure of his Private Information, including loss of privacy and loss of control over that information, as reflected by the dark-web alert and increased spam calls he received following the Data Breach.

236. Plaintiff Chapman suffered actual injury in the form of damage to and diminution in the value of his Private Information, a form of intangible property that Defendants were required to protect against unauthorized access and disclosure.

237. As a direct and traceable result of the Data Breach, Plaintiff Chapman has suffered actual injury and damages, including, but not limited to: (i) loss of privacy and control over his Private Information; (ii) dark-web exposure of his personal information; (iii) an increase in unsolicited spam calls; (iv) damage to and diminution in the value of his Private Information; and (v) present and continuing exposure to an increased risk of identity theft and fraud. Plaintiff Chapman has not identified financial fraud or incurred out-of-pocket mitigation expenses to date.

238. Plaintiff Chapman has been and will continue to be at a heightened risk of future identity theft and fraud because the information identified in the Notice Letter includes persistent identifiers such as his date of birth and Social Security number, and because he received a dark-web exposure alert following the Data Breach.

239. Plaintiff Chapman did not consent to Defendants' release of his Private Information to unauthorized third parties, and he would not have permitted Defendants to collect, store, or maintain his Private Information had he known of Defendants' deficient cybersecurity practices.

240. Plaintiff Chapman has a continuing interest in ensuring that his Private Information remaining in Defendants' possession is protected and safeguarded from future data breaches. Without Court intervention, Plaintiff Chapman's Private Information will continue to be at risk of imminent misuse and harm.

***Plaintiff Justin Dekrechewo***

241. Plaintiff Justin Dekrechewo has had a mortgage directly through Lennar Mortgage, LLC since 2020, when he purchased a home constructed by Lennar Corporation. Through this relationship, Plaintiff Gordon provided his sensitive Private Information to Defendants.

242. Plaintiff Dekrechewo's mortgage was subsequently transferred from Lennar Mortgage, LLC to another institution.

243. Upon information and belief, Defendant's retained all of Plaintiff Dekrechewo's Private Information despite no longer having a business need to retain it.

244. Plaintiff Dekrechewo received a Notice Letter from Defendant Lennar Mortgage, LLC dated August 14, 2026, informing him that an unauthorized party had accessed certain Lennar Mortgage, LLC systems between May 26, 2026 and June 1, 2026, and that his sensitive personal information, including his name, contact information, date of birth, and Social Security number, may have been affected.

245. Plaintiff Dekrechewo entrusted his Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would keep his Private Information secure from unauthorized access.

246. Plaintiff Dekrechewo reasonably understood that a portion of the funds he paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

247. By soliciting and accepting Plaintiff Dekrechewo's Private Information, Defendants agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

248. Plaintiff Dekrechewo would not have provided his Private Information to Defendants had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

249. Upon information and belief, Defendants were in possession of Plaintiff Dekrechewo's Private Information before, during, and after the Data Breach.

250. As a result, Plaintiff Dekrechewo was injured by Defendants' Data Breach.

251. In May 2026, Plaintiff Dekrechewo suffered fraudulent activity in one of his accounts, incurring an unauthorized charge of $150. The temporal proximity to the Breaches indicates that it is related to Defendant's inadequate security measures.

252. In response to the Data Breach, Plaintiff Dekrechewo enrolled in the two years of identity monitoring offered by Lennar Mortgage, LLC and continues to monitor for suspicious activity. He has spent time addressing and monitoring the consequences of the Data Breach.

253. Plaintiff Dekrechewo will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

254. Plaintiff Dekrechewo places significant value in the security of his Private Information and does not readily disclose it. Plaintiff Dekrechewo entrusted Defendants with his Private Information with the understanding that Defendants would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Private Information would not be compromised.

255. Because Plaintiff Dekrechewo's sensitive personal information was impacted by the Data Breach, he faces an increased risk of identity theft and fraud and must remain vigilant for potential misuse of that information.

256. Plaintiff Dekrechewo suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

257. Plaintiff Dekrechewo suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants was required to adequately protect and safeguard against unauthorized disclosure.

258. Plaintiff Dekrechewo enrolled in identity monitoring and expects to continue monitoring because the notice states that his name, contact information, date of birth, and Social Security number may have been affected.

259. Plaintiff Dekrechewo spends between 5 and 10 hours every week since the Breach monitoring his credit and identity, reviewing accounts and statements for suspicious or unauthorized activity.

260. Plaintiff Dekrechewo's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

261. The potential exposure of his Private Information and the need for continued monitoring have caused Plaintiff Dekrechewo anxiety beyond mere worry.

262. The Data Breach has caused Plaintiff Dekrechewo to suffer anxiety and concern regarding the security and potential misuse of his Private Information.

263. Plaintiff Dekrechewo has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

264. As a direct and traceable result of the Data Breach, Plaintiff Dekrechewo has suffered actual injury and damages, including, but not limited to: (i) lost time spent responding to and monitoring the consequences of the Data Breach; (ii) loss of privacy associated with the potential exposure of his Private Information; (iii) anxiety and concern regarding possible misuse of his Private Information; (iv) diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff Dekrechewo; and (v) present and continuing exposure to an increased risk of identity theft and fraud.

265. Plaintiff Dekrechewo has been and will continue to be at a heightened risk of future identity theft and fraud because the information identified in the Notice Letter includes persistent identifiers such as his date of birth and Social Security number.

266. Plaintiff Dekrechewo has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Dekrechewo's Private Information will be wholly unprotected and at-risk of future data breaches.

267. Plaintiff Dekrechewo did not consent to Defendants' release of his Private Information to unauthorized third parties, and Plaintiff Dekrechewo would not have permitted Defendants to collect, store, or maintain his Private Information had he known of Defendants' deficient cybersecurity practices.

***Plaintiff Mark Revello***

268. Plaintiff Revello purchased a house from Lennar Corporation in 2023 and received a mortgage through Lennar Mortgage, LLC. Through this relationship, Plaintiff Revello provided his sensitive Private Information to Defendants.

269. Plaintiff Revello entrusted his Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would keep his Private Information secure from unauthorized access.

270. By soliciting and accepting Plaintiff Revello's Private Information, Defendants agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

271. Plaintiff Revello would not have provided his Private Information to Defendants had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

272. Plaintiff Revello reasonably understood that a portion of the funds he paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

273. Upon information and belief, Defendants were in possession of Plaintiff Revello's Private Information before, during, and after the Data Breaches.

274. As a result, Plaintiff Revello was injured by Defendants' Data Breaches.

275. In response to the Data Breaches, Plaintiff Revello made reasonable efforts to mitigate the impact of the Data Breaches, including, but not limited to researching the Data Breaches, reviewing and monitoring his accounts for fraudulent activity, and registering for identify theft monitoring services. Plaintiff Revello estimates he has already spent at least 4 hours responding to the Data Breaches.

276. Plaintiff Revello will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

277. Plaintiff Revello places significant value in the security of his Private Information and does not readily disclose it. Plaintiff Revello entrusted Defendants with his Private Information with the understanding that Defendants would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Private Information would not be compromised.

278. Because of the Data Breach, there is no doubt Plaintiff Revello's highly confidential Private Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Revello and the Class are at an imminent risk of identity theft and fraud.

279. Plaintiff Revello suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

280. Plaintiff Revello suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants was required to adequately protect and safeguard against unauthorized disclosure.

281. Due to Defendants' Data Breaches, Plaintiff Revello will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendants' breach of duty to maintain Plaintiff Revello's highly sensitive Private Information secure and protected against unauthorized disclosure.

282. Plaintiff Revello's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

283. Knowing that thieves intentionally targeted and accessed his Private Information, has caused Plaintiff Revello great anxiety beyond mere worry.

284. The Data Breaches have caused Plaintiff Revello to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in notifying him of the fact that his Private Information was accessed and/or acquired by criminals as a result of the Data Breaches.

285. Plaintiff Revello has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

286. As a direct and traceable result of the Data Breaches, Plaintiff Revello suffered actual injury and damages after his Private Information was compromised and stolen in the Data

Breaches, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendants did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff Revello; and (vii) other economic and non-economic harm.

287. Plaintiff Revello has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

288. Plaintiff Revello has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Revello's Private Information will be wholly unprotected and at risk of future data breaches.

289. Plaintiff Revello did not consent to Defendants' release of his Private Information to unauthorized third parties, and Plaintiff Revello would not have permitted Defendants to collect, store, or maintain his Private Information had he known of Defendants' deficient cybersecurity practices.

## V. <u>CLASS ACTION ALLEGATIONS</u>

290. Plaintiffs re-allege and incorporate by reference paragraphs 1-332 as if fully restated here.

291. Plaintiffs bring this action against Defendants individually and on behalf of all others similarly situated under Federal Rule of Civil Procedure 23. Plaintiffs assert all claims on behalf of the class (the "Class") defined as follows:

> **All persons whose Private Information was accessed and/or compromised as a result of the Data Breaches, including all persons that were sent a Notice Letter.**

292. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and their judicial staff members.

293. Plaintiffs reserve the right to amend or modify the above Class definition or to propose subclasses in subsequent pleadings and motions for class certification.

294. Plaintiffs anticipate the issuance of notice setting forth the subject and nature of the instant action to the proposed Class. Upon information and belief, Defendants' own business records or electronic media can be utilized for the notice process.

295. The proposed Class meets the requirements of Rule 23(a) and (b).

296. **Numerosity.** Class Members are so numerous that joining all members is impracticable. Defendant has reported that tens of thousands of individuals were affected by the Breaches. Each Class Member is apparently identifiable within Defendants' records.

297. **Typicality.** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breaches. Plaintiffs and all members of the Class were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims

therefore arise from the same practices or course of conduct that gives rise to the claims of all Class Members.

298. **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the Class. Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation, and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

299. **Superiority**. A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for individual members of the Class to effectively redress Defendants' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

300. **Commonality and Predominance.** Defendants engaged in a common course of conduct toward Plaintiffs and Class Members, in that Plaintiffs' and Class Members' Private Information was stored on the same network and unlawfully accessed in the same way. There are many questions of law and fact common to the claims of Plaintiffs and the other members of the

Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a. Whether Defendants engaged in the wrongful conduct alleged herein;

b. Whether Defendants owed a duty to Plaintiffs and Class Members to adequately protect their Private Information;

c. Whether Defendants breached their duty to Plaintiffs and Class Members to adequately protect their Private Information;

d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breaches;

e. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f. Whether Defendants' data security systems prior to and during the Data Breaches were consistent with industry standards;

g. Whether Defendants knew or should have known that their computer and network security systems, or the computer and network security systems of their vendors, were vulnerable to cyberattacks;

h. Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the Data Breaches;

i. Whether Defendants were negligent in permitting unencrypted Private Information belonging to thousands of individuals to be stored within their network;

j. Whether Defendants were negligent in failing to adhere to reasonable data retention policies;

k. Whether Defendants breached implied contractual duties to Plaintiffs and the Class to use reasonable care in protecting their Private Information;

l. Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

m. Whether Defendants should have discovered the Data Breaches sooner;

n. Whether Defendants failed to adequately respond to the Data Breaches, including failing to investigate them diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and the Class;

o. Whether Defendants continue to breach duties owed to Plaintiffs and the Class;

p. Whether Plaintiffs and the Class suffered injuries as a proximate result of Defendants' negligent actions or failures to act;

q. Whether Defendants were negligent in selecting, supervising, and/or monitoring vendors;

r. Whether Plaintiffs and the Class are entitled to recover damages, equitable relief, and other relief;

s. Whether Defendants' actions alleged herein constitute gross negligence, and whether Plaintiffs and Class Members are entitled to punitive damages; and

t. Whether the First Data Breach placed Defendants on notice that their shared systems were vulnerable to unauthorized intrusion, and whether Defendants failed to remediate those vulnerabilities before the Second Data Breach.

301. Common sources of evidence may also be used to demonstrate Defendants' unlawful conduct on a class-wide basis, including, but not limited to, documents and testimony

about their data and cybersecurity measures (or lack thereof); testing and other methods that can prove Defendants' data and cybersecurity systems have been or remain inadequate; documents and testimony about the source, cause, and extent of the Data Breaches; and documents and testimony about any remedial efforts undertaken as a result of the Data Breaches.

302. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed are representatives of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

303. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

304. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

305. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards

of conduct toward the Class Members and making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

306. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

307. Plaintiffs re-allege and incorporate by reference paragraphs 1-306 as if fully restated here.

308. Defendants solicited, collected, stored, and maintained the Private Information of Plaintiffs and Class Members on inadequately secured computer systems and networks.

309. Upon accepting and storing Plaintiffs' and Class Members' Private Information on their computer systems and networks, Defendants undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information from unauthorized access and disclosure.

310. Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their computer systems and networks, and the personnel responsible for them, adequately protected the Private Information.

311. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

312. Defendants had full knowledge of the sensitivity of the Private Information in their possession and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully accessed or disclosed. Plaintiffs and Class Members were therefore the foreseeable victims of any inadequate data security practices.

313. Defendants' duty to implement and maintain reasonable data security practices arose as a result of the special relationship that exists between Defendants and consumers, which is recognized by laws and regulations, including, but not limited to, the FTC Act and common law.

314. Defendants were in a superior position to ensure their data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

315. Defendants knew Plaintiffs and Class Members relied on them to protect their Private Information. Plaintiffs and Class Members could not assess the data security practices used by Defendants. Because they had no means to identify Defendants' security deficiencies, Plaintiffs and Class Members had no opportunity to safeguard their Private Information from cybercriminals. Defendants exercised control over the Private Information stored on their systems and networks; accordingly, Defendants were best positioned and most capable of preventing the harms caused by the Data Breaches.

316. Defendants were aware, or should have been aware, of the fact that cybercriminals routinely target entities storing PII through cyberattacks in an attempt to steal valuable Private

Information. In other words, Defendants knew of a foreseeable risk to their data security systems but failed to implement reasonable security measures.

317. Defendants owed Plaintiffs and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard or delete such data and providing notice to Plaintiffs and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

318. Defendants' duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

319. Defendants had a duty to implement and maintain reasonable data security practices pursuant to Section 5 of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect sensitive and confidential data.

320. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also formed part of the basis of Defendants' duty in this regard.

321. Defendants also collected and stored Plaintiffs' and Class Members' health-related information. The HIPAA Security Rule and the HITECH Act set out specific administrative, physical, and technical safeguards for protecting such information. *See* 45 C.F.R. §§ 164.308,

164.310, 164.312. These safeguards reflect widely recognized measures of reasonable data security and inform the standard of care Defendants owed at common law, as well as the foreseeable risk that inadequate security would expose this information. Plaintiffs bring no claim under HIPAA or the HITECH Act and do not allege that Defendants are covered entities or business associates. Plaintiffs cite these standards solely as evidence of the reasonable care Defendants owed and failed to provide.

322. Defendants solicited, collected, stored, and maintained Plaintiffs' and Class Members' Private Information as part of their regular business, which affects commerce.

323. Defendants violated the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and by failing to comply with applicable industry standards, as described herein.

324. Defendants breached their duties to Plaintiffs and the Class under the FTC Act by failing to implement and maintain fair, reasonable, and adequate data security practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to provide prompt notice of the Data Breach without unreasonable delay.

325. Defendants' multiple failures to comply with applicable laws and regulations constitute negligence *per se*.

326. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

327. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, like Defendants, that fail to employ reasonable data security measures and avoid unfair and deceptive practices, causing the same harm as that suffered by Plaintiffs and the Class.

328. Defendants breached their duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice of the Data Breaches expeditiously and/or as soon as practicable to Plaintiffs and the Class.

329. Defendants' violations of the FTC Act constitute negligence *per se*.

330. The injury and harm that Plaintiffs and Class members have suffered and continue to suffer (as alleged above) are the direct and proximate result of Defendants' negligence *per se*.

331. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information.

332. The specific negligent acts and omissions committed by Defendants include, but are not limited to:

a. Failing to adopt, implement, and maintain adequate data security measures to safeguard Plaintiffs' and Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to ensure their email systems had plans in place to maintain reasonable data security safeguards;

d. Failing to implement and maintain adequate mitigation policies and procedures;

e. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;

f. Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised; and

g. Failing to timely notify Plaintiffs and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages; and

h. After the First Data Breach placed Defendants on notice that their shared systems had been penetrated, failing to identify and remediate the vulnerabilities in those systems prior to the occurrence of the Second Data Breach approximately two months later.

333. Defendants' willful failure to abide by their duties to Plaintiffs and Class Members was wrongful, reckless, and grossly negligent considering the foreseeable risks and known threats.

334. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members.

335. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial industry.

336. As a direct and proximate result of Defendants' negligent conduct, including, but not limited to, their failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

337. Through Defendants' acts and omissions described herein, including but not limited to Defendants' failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure the Private Information of Plaintiffs and Class Members while it was within Defendants' possession and control.

338. Further, through their failure to provide timely and clear notice of the Data Breach to Plaintiffs and Class Members, Defendants prevented Plaintiffs and Class Members from taking

meaningful, proactive steps to secure their Private Information and mitigate the impact of the Data Breaches.

339. Plaintiffs and Class Members could have taken actions earlier had they been timely notified of the Data Breaches. Yet, Defendants delayed noticing Plaintiffs and Class Members of the Breaches.

340. Plaintiffs and Class Members could have enrolled in credit monitoring, instituted credit freezes, and changed their passwords, among other things, had they been alerted to the Data Breaches more quickly.

341. Plaintiffs and Class Members suffered harm from Defendants' delay in notifying them of the Data Breaches.

342. As a direct and proximate result of Defendants' conduct, including, but not limited to, Defendants' failure to implement and maintain reasonable data security practices and procedures, Plaintiffs and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost time and opportunity costs associated with efforts expended to address and mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information,

which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

343. The damages Plaintiffs and the Class have suffered and will suffer (as alleged above) were and are the direct and proximate result of Defendants' negligent conduct.

344. Plaintiffs and the Class have suffered cognizable injuries and are entitled to actual and punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

345. Plaintiffs re-allege and incorporate by reference paragraphs 1-306 as if fully restated here.

346. Defendants solicited, collected, stored, and maintained Plaintiffs' and Class Members' Private Information as part of Defendants' regular business practices.

347. Plaintiffs and Class Members were required to provide their Private Information to Defendants, directly or indirectly, to receive services. Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services.

348. Defendants solicited and accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

349. In delivering, directly or indirectly, their Private Information to Defendants and paying for services, Plaintiffs and Class Members intended and understood that Defendants would adequately safeguard their Private Information.

350. Plaintiffs and Class Members reasonably expected that the Private Information they entrusted to Defendants to receive services would remain confidential and would not be shared or disclosed to criminal third parties.

351. Plaintiffs and Defendants had a mutual understanding that Defendants would implement and maintain adequate and reasonable data security practices and procedures to protect Plaintiffs' and Class Members' sensitive Private Information. Plaintiffs and Defendants also shared an expectation and understanding that Defendants would not share or disclose, whether intentionally or unintentionally, the sensitive Private Information in their possession and control.

352. Based on Defendants' representations, legal obligations, and acceptance of Plaintiffs' and Class Members' Private Information, Defendants had a duty to safeguard the Private Information in their possession using reasonable data security practices.

353. When Plaintiffs and Class Members paid money and provided their Private Information to Defendants, either directly or indirectly, in exchange for goods or services, they entered into implied contracts with Defendants.

354. Defendants entered into implied contracts with Plaintiffs and the Class under which Defendants agreed to comply with their statutory and common law duties to safeguard and protect Plaintiffs' and Class Members' Private Information and to timely notify Plaintiffs and Class Members of a data breach. In exchange, Plaintiffs and Class Members provided their Private Information to Defendants and paid money to Defendants, directly or indirectly, a portion of which was to ensure that Defendants maintained adequate security measures to protect the PII of Plaintiffs and the Class.

355. The implied promise of confidentiality includes consideration beyond those pre-existing duties owed under Section 5 of the FTC Act and other state and federal regulations. The

additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

356. The implied promises include, but are not limited to: (i) taking steps to ensure any agents or vendors who are granted access to Private Information protect the confidentiality of that information; (ii) taking steps to ensure that Private Information in the possession and control of Defendants, their agents, and/or vendors is restricted and limited to achieve an authorized business purpose; (iii) restricting access to qualified and trained agents and/or vendors; (iv) designing and implementing appropriate retention policies to protect the Private Information from unauthorized access and disclosure; (v) applying or requiring proper encryption of the Private Information; (vi) requiring multifactor authentication for access to the Private Information; and (vii) other steps necessary to protect against foreseeable data breaches.

357. Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of such implied contracts.

358. Defendants recognized that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance to Plaintiffs and Class Members.

359. Had Defendants disclosed to Plaintiffs and Class Members that they did not have adequate data security practices to secure their Private Information, Plaintiffs and Class Members would not have provided their Private Information to Defendants.

360. Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendants.

361. Defendants breached the implied contracts with Plaintiffs and Class Members by failing to safeguard Plaintiffs' and Class Members' Private Information and by failing to provide them with timely and accurate notice of the Data Breaches.

362. As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiffs and Class Members have suffered damages, including foreseeable consequential damages that Defendants knew about when they solicited and collected Plaintiffs' and Class Members' Private Information.

363. Plaintiffs and the Class have suffered injuries as described above, and are entitled to actual and punitive damages, statutory damages, and reasonable attorneys' fees and costs, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

364. Plaintiffs re-allege and incorporate by reference paragraphs 1-306 as if fully restated here.

365. Plaintiffs allege this claim in the alternative to their breach of implied contract claim.

366. Plaintiffs and the Class provided their Private Information to Defendants in order to receive services.

367. By conferring their Private Information to Defendants, Plaintiffs and Class Members reasonably understood Defendants would be responsible for securing their Private Information from unauthorized access and disclosure.

368. Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from money they make based on protecting Plaintiffs' and Class Members' Private Information.

369. Plaintiffs and Class Members paid Defendants, directly or indirectly, a certain sum of money, which was used to fund data security via contracts with Defendants.

370. As such, a portion of the payments made by or on behalf of Plaintiffs and the Class was to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

371. Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

372. Protecting the Private Information of Plaintiffs and Class Members is integral to Defendants' business. Without their Private Information, Defendants would be unable to provide their core business services.

373. Plaintiffs and Class Members directly conferred a monetary benefit on Defendants by supplying their Private Information, from which Defendants derive their business, and which should have been protected with adequate data security.

374. Defendants solicited, collected, stored, and maintained Plaintiffs' and Class Members' Private Information, and as such, Defendants had direct knowledge of the monetary benefits conferred upon them by Plaintiffs and the Class. Defendants profited from these transactions and used Plaintiffs' and Class Members' Private Information for business purposes.

375. Indeed, Plaintiffs and Class Members who were customers of Defendants provided monetary payment to Defendants and therefore conferred a benefit unto Defendants.

376. Defendants appreciated that a monetary benefit was being conferred upon them by Plaintiffs and Class Members and accepted that monetary benefit.

377. Under the facts and circumstances outlined above, however, it is inequitable for Defendants to retain that benefit without payment of the value thereof.

378. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

379. Instead of providing a reasonable level of security that would have prevented the Data Breaches, Defendants instead calculated to increase their own profits to the detriment of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite data security.

380. Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary benefit belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures.

381. Defendants acquired Plaintiffs' and Class Members' Private Information through inequitable means by failing to disclose their inadequate data security practices, as previously alleged.

382. If Plaintiffs and Class Members knew that Defendants had not secured their Private Information, they would not have allowed Defendants to collect their Private Information.

383. Plaintiffs and Class Members have no adequate remedy at law.

384. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered or will suffer injury, including, but not limited to: (i) actual identity theft and fraud; (ii) loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or

unauthorized use of their Private Information; (v) lost time and opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach, including, but not limited to, effort and time spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; and/or (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Data Breaches for the remainder of the lives of Plaintiffs and Class Members.

385. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

386. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, all gains that they unjustly received.

**FOURTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class)**

387. Plaintiffs re-allege and incorporate by reference paragraphs 1-306 as if fully restated here.

388. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights, statuses, and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of federal and state law as described in this Complaint.

389. An actual controversy has arisen in the wake of the Data Breaches regarding Plaintiffs' and Class members' Private Information and whether Defendants are currently

maintaining data security measures adequate to protect Plaintiffs and Class members from further data breaches that compromise their Private Information. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and remains at imminent risk that further compromises of their Private Information will occur in the future.

390. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

391. Defendants owe a legal duty to secure Private Information and to timely notify impacted individuals of a data breach under the common law and state statutes; and

392. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Private Information in their possession.

393. This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect Private Information in Defendants' data network.

394. If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

395. The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Lennar if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damages. On the other hand, the cost to Defendants of complying with an injunction by

employing reasonable protective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

396. Issuance of the requested injunction is in the public interest. Such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiffs and Class members whose confidential information would be further compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendants as follows:

A. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

B. A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including compensatory damages, nominal damages, punitive damages, attorneys' fees, expenses, costs, and such other and further relief as is just and proper;

C. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

D. An order requiring Defendants to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

E. A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

F. An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on any and all issues raised in this Amended Consolidated Class Action Complaint so triable as of right.

DATED: October 16, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART A. DAVIDSON
Florida Bar No. 0084824

**Stuart A. Davidson**
STUART A. DAVIDSON

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
sdavidson@rgrdlaw.com

*Plaintiffs' Interim Liaison Counsel*

ZIMMERMAN REED LLP
BRIAN C. GUDMUNDSON, (*pro hac vice*)
MICHAEL L. LAIRD (*pro hac vice*)
BENJAMIN R. COOPER (*pro hac vice*)
MADISON M. DEMARIS (*pro hac vice*)
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612/341-0400
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
benjamin.cooper@zimmreed.com
madison.demaris@zimmreed.com

AYLSTOCK, WITKIN, KREIS
& OVERHOLTZ, PLC
JEAN MARTIN (*pro hac vice*)
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850/202-1010
jmartin@awkolaw.com

ISRAEL DAVID LLC
ISRAEL DAVID (*pro hac vice*)
60 Broad Street, Suite 2900
New York, NY 10004
Telephone: 212/350-8850
israel.david@davidllc.com

*Plaintiffs' Interim Co-Lead Class Counsel*